Tina BAILEY *v.* Mark BAILEY

CA 06-660                                         244 S.W.3d 712

Court of Appeals of Arkansas

Opinion delivered December 6, 2006

[Rehearing denied January 24, 2007.]

---

*Hilburn, Calhoon, Harper, Pruniski & Calhoun, LTD.*, by: *Sam Hilburn* and *Traci LaCerra*, for appellant.

*Osment Law Firm, P.A.*, by: *Pamela S. Osment*, for appellee.

S AM BIRD, Judge. Tina Bailey brings this appeal from a decree of the Faulkner County Circuit Court filed on March 15, 2006, which granted her a divorce from Mark Bailey and ordered the parties to share joint custody of their two minor children. Appellant contends that the trial court abused its discretion by awarding joint custody, by failing to award sufficient alimony to her, and by dividing the marital debt equally. We reverse and remand on all points.

## Joint Custody

Joint custody or equally divided custody of minor children is disfavored in Arkansas; however, Ark. Code Ann. § 9-13-101(b)(1)(A)(ii) as amended in 2003 specifically permits the court to consider such an award. *Dansby v. Dansby*, 87 Ark. App. 156, 189 S.W.3d 473 (2004). Equally divided custody of minor children may be ordered where the circumstances clearly warrant it; if it is shown that the interest of the child is better fostered by divided custody, we have held that this is a proper order for a court to make. *Hansen v. Hansen*, 11 Ark. App. 104, 666 S.W.2d 726 (1984). A crucial factor bearing on the propriety of joint custody is the parties' mutual ability to cooperate in reaching shared decisions in matters affecting the child's welfare. *Dansby, supra.*

Our law is well settled that the primary consideration in child custody is the child's best interest at the time of the final hearing as demonstrated by the record. *Hobbs v. Hobbs*, 75 Ark. App. 186, 55 S.W.3d 331 (2001). The time for parties to demonstrate the mutual ability to cooperate in reaching shared decisions in matters affecting a child's welfare so as to justify an award of joint custody is before and at the hearing that is the basis of the joint-custody award, not some later time in an unknown future based on unproven facts. *Id.*

Here, stating that its decision was not easy, the court ruled from the bench that both parents were fit to have custody but that it would grant the joint custody requested by appellee. The court observed, "I think they can work together now that the financial strains aren't there as much." Appellant contends that the parties are not able to communicate or to reach shared decisions regarding what is best for the minor children.

Appellant testified that she had agreed to temporary joint custody of "one week on and one week off" because appellee wanted it desperately and she did not want to keep him from the children, but she stated that the joint custody had not worked. She agreed that the boys were doing well in school although the younger son's behavior had gotten worse in the last year. She said that the boys had a good relationship with appellee, that she did not mind his seeing them whenever he wanted to, but that she did not want the boys moved physically from one house to another.

Appellant asserts that appellee has undermined her role as a parent by a pattern of manipulation, as exemplified in the following instances to which she testified. Appellee purchased a dirt bike for one son despite appellant's voicing to appellee her preference that it not be bought and despite her safety concerns. Appellee did not discuss two trips with her prior to planning them, each of which included days that were scheduled to be hers with the boys: she found out from the boys about a ski trip to Canada, and appellee announced upon returning from the six-day ski trip that he was taking the boys duck hunting the next weekend. Appellant appeared at the younger boy's classroom for his school Christmas party, as had been previously planned, only to find out from his teacher that he had been checked out by appellee: appellant kept calling appellee until she found out that the two of them were in Little Rock, shopping for Christmas. Appellant also testified that the parties did not agree on the boys' discipline: she said that her method began with talking to them and administering punishment according to the seriousness of what had been done, while appellee "gets to the boiling point, . . . just blows up at them," and once hit the younger son in the head with the barrel of a paint-ball gun for failing to clean up his room.

Appellant also argues that appellee is of the mind-set that he is the authoritative figure, with appellant to be submissive and subjective to him, and that joint custody enables him to control his ex-wife. Appellee testified regarding a list he had written in preparation for counseling issues. The list and his testimony reflect his belief that, in the biblical sense, the wife should be submissive and subjective to her husband's wishes and authority. Appellee stated that God created man to be the leader of the house and to establish the environment so that a woman would want to be submissive, that a husband and wife were equals in terms of making decisions about their children, and that appellant would no longer have to be submissive after divorce because she no longer would be

his wife. He testified that he disagreed that he and appellant could not get along as husband as wife, and he said that they were divorcing because she wanted the divorce. He said that they had been able to communicate in terms of their temporary agreement of each having the boys for a week, but that appellant failed to extend parental courtesy to him in not telling him about the younger son going to his heart doctor for a checkup and in not consulting him about the older going to First Baptist youth group on Wednesday nights.

Asking the trial court to award joint custody, appellee stated that the temporary custody had gotten into a decently normal routine with flexibility about visitation; he stated that he was extremely concerned that appellant might choose to relocate geographically if he did not share custody with her. He said that, shortly before the hearing, he had gone to the house when appellant contacted him about the younger son's stubbornness in not wanting to go to a basketball practice; appellee finally took him and worked with him at practice. He said that on other occasions, "I just [had] to reign in as the father because I'm the father figure. That's the way the good Lord made the father is to be the ultimate authority in the house. . . . So there are times when I've had to intervene at her request, and I don't mind doing that."

The appellate court does not disturb a circuit court's findings unless they are clearly against a preponderance of the evidence, giving due regard to the opportunity of the court to judge the credibility of the witnesses. *Hansen, supra.* In cases involving child custody a heavier burden is cast upon the circuit court to utilize to the fullest extent all of its powers of perception in evaluating the witnesses, their testimony and the children's best interest. *Id.* This court has no such opportunity and we know of no case in which the superior position, ability and opportunity of a circuit court to observe the parties carries as great a weight as one involving minor children. *Id.*

We do not depart from these well established tenets. However, considering the attitudes of the parents toward each other and toward their respective roles before and at the date of the hearing, the fact that a basis of appellee's request for joint custody was his concern that appellant might choose to relocate if she had sole custody, and the parties' differing opinions as to disciplining the children, we conclude in the present case that the trial court's finding that the parties could work together was clearly erroneous. Thus, the court's finding that the children's best interest would be

fostered by ordering joint custody is also clearly erroneous. The award of joint custody is reversed and remanded.

## The Award of Alimony

The trial court ordered appellee to pay appellant alimony in the amount of $250 per week for six months from the date of the divorce decree. As her second point on appeal, appellant contends that the trial court abused its discretion by failing to award sufficient alimony to her.

The decision whether to award alimony is a matter that lies within the trial judge's sound discretion, and on appeal, this court will not reverse a trial judge's decision to award alimony absent an abuse of that discretion. *Cole v. Cole*, 89 Ark. App. 134, 201 S.W.3d 21 (2005). The primary factors that a court should consider in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Id.* A court may also consider other factors, including the parties' financial circumstances; the amount and nature of the parties' income, both current and anticipated; the extent and nature of the parties' resources and assets; the parties' earning ability and capacity. *Id.* Section III(e) of Administrative Order No. 10 of the Arkansas Supreme Court also gives guidance on spousal support: "The [family support] chart assumes that the custodian of dependent children is employed and is not a dependent. . . . For final hearings, the court should consider all relevant factors, including the chart, in determining the amount of any spousal support to be paid." *In re Admin. Order No. 10*, 347 Ark. App'x 1064, 1069 (2002) (per curiam).

The parties here were married for twenty-four years and had two sons, aged nine and fourteen at the time of the divorce. Appellee worked throughout the marriage and earned an average take-home pay of $7000 a month from his primary employment; he also received income from being on the Quorum Court and from refereeing high school, college, and arena league football games. Appellant worked at Acxiom from 1990 until the birth of their first child in 1992, when she quit to care for him. She went back to work part-time there from 1993 or 1994 until 2001, and worked full time for a year in 2002 after appellee was laid off from the company. Except for holiday employment in 2005 at JC Penney and Belk, she did not work again before the divorce hearing in February 2006. Appellant testified that she had interviewed with JC Penney, Belk, Oxford Learning, J.K. Kirkland &

Associates, and another employment service; a list introduced at the hearing shows that she sent resumes or had interviews for over thirty jobs. She was not employed, however, at the time of the hearing.

Here, the court ruled that sale proceeds from the marital house were to apply to satisfaction of the mortgage, an equity loan, and remaining debt. Appellant was awarded half of the parties' retirement accounts: Merrill Lynch had an approximate balance of $125,000; Edward Jones was approximately $11,000; Fidelity Investments was approximately $92,000; and there was an IRA of $1,500. Appellant and appellee each were to retain possession of their own life insurance policies and to pay the premiums.

■ It is clear to us that appellant has no assets at this time, other than those awarded by the court, upon which to rely for support. She worked part time for approximately half of the fourteen years from the birth of the parties' first child until the time of divorce; she worked full time for one year in 2002 and, as of 2006, did not work again except for one holiday season. Should she withdraw these retirement and life insurance funds, she undoubtedly will suffer tax disadvantages and incur substantial penalties, thus lessening her assets even more. She has no other assets or resources. Her current needs far outweigh appellee's ability to provide alimony for six months that amounts to less than one month's income for him. We hold that the trial court abused its discretion in making an insufficient award of alimony, and we remand for action in keeping with our decision.

### Division of Marital Debt

The trial court ordered that each party pay one-half of marital debts amounting to $78,916.33. The written order reads in pertinent part:

The following are marital debts and the responsibility for paying these debts shall be divided equally with each party paying one-half (½) the debts:

| | |
|---|---|
| HSBC | $ 4,204.00 |
| Merrill Lynch | $ 10,295.18 |
| Chase | $ 10,524.38 |
| Chase | $ 3,000.00 |

| | |
|---|---|
| Bank One | $ 11,558.49 |
| MBNA | $ 12,381.00 |
| American Express | $ 4,900.00 |
| Colony Shop | $ 600.00 |
| Conway Regional | $ 225.00 |
| Bank of America | $ 300.88 |
| Check Alert | $ 399.00 |
| First Security Bank | $ 528.81 |
| Bailey Paint Loan | $ 13,000.00 |
| Mary Cook Loan | $ 5,000.00 |

Until these Debts are paid in full the [appellee] shall assume responsibility for paying the credit cards that are in his name except the Chase card with a balance of $3,000.00, the MBNA, Colony Shop, Check Alert and First Security cards/debts which the [appellant] shall assume responsibility for paying.

The evidence showed that the parties drove nice cars, traveled, and after 1992 had been able to afford appellant's working only part time or not at all in order to stay home except for one year. Part of the parties' debt was accumulated from a part-time business that appellant once pursued as a hobby, part was attributable to charges that she made when appellee was laid off, and further debt was acquired during the pendency of the divorce. Large-ticket items purchased by appellee included a $12,000 Polaris; the Honda dirt bike for a son; the $2,300 ski trip with the boys; guns; and a Toyota from credit-card equity.

An allocation of the parties' debt is an essential item to be resolved in a divorce dispute, and it must be considered in the context of the distribution of all of the parties' property. *Williams v. Williams*, 82 Ark. App. 294, 108 S.W.3d 629 (2003). A judge's decision to allocate debt to a particular party or in a particular manner is a question of fact and will not be reversed on appeal unless clearly erroneous. *Id.* It is not error to determine that debts should be allocated between the parties in a divorce case on the basis of their relative ability to pay. *Id.* Furthermore, the effect of an allocation of debt on a spouse's lifestyle is a valid consideration; the supreme court has affirmed unequal debt allocations where a husband was able to pay the debts from income without materially changing his style of life but the wife could not pay the debts from

her income without disposing of assets to pay part of the debt. *Id.* (citing *Richardson v. Richardson*, 280 Ark. 498, 503, 659 S.W.2d 510, 513 (1983)).

■ In light of the award of marital property, the trial court abused its discretion in ordering appellant to pay half of these marital debts. *See Williams, supra; In re Admin. Order No. 10, supra.* It is not economically feasible for appellant to deplete the property awarded to her as half of the marital property in order to pay half of the debt, and appellee has far more ability to earn substantial income than she does at this time. Were this award to remain in effect, appellant would be reduced to poverty.

The division of marital debt is reversed and remanded. Although this court has the power to decide equity cases de novo on the record, we may decline to do so if we conclude that justice would be better served by a remand to the trial court. *Reaves v. Reaves*, 63 Ark. App. 187, 975 S.W.2d 882 (1998). We think it appropriate to remand this case to the trial court for further consideration of the disposition of marital property and the division of debt in accordance with the equities of this case.

The award of joint custody is reversed, and the case is remanded for determination of custody and related issues. The division of debt, to be considered along with the award of alimony, is also reversed and remanded.

Reversed and remanded.

HART and GRIFFEN, JJ., agree.